Thomas M. Melton (4999)
Karen L. Martinez (7914)
Attorneys for Plaintiff
United States Securities & Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah 84144-0402
Tel.  801-524-5796

FILED
CLERK, U.S. DISTRICT COURT

16 OCT 03 AM 9: 07

DISTRICT OF UTAH

BY:_____
     DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

v.

DAVID M. WOLFSON; NUWAY HOLDING, INC., a
Nevada corporation; MOMENTOUS GROUP, LLC, a
Utah limited liability company; LEEWARD
CONSULTING GROUP, LLC, a Utah limited liability
company; SUKUMO LIMITED, a company incorporated
in the British Virgin Islands (a.k.a. SUKUMO GROUP,
LTD., FUJIWARA GROUP, FIRST CHARTERED
CAPITAL CORPORATION, FIRST COLONIAL TRUST,
FIRST CHINA CAPITAL, AND INTERNATIONAL
INVESTMENT HOLDING); MICHAEL SYDNEY
NEWMAN (A.K.A. MARCUS WISEMAN); STEM
GENETICS, INC., a Utah corporation; HOWARD H.
ROBERTSON; GINO CARLUCCI; G & G CAPITAL,
LLC, an Arizona and Utah limited liability company; F10
OIL AND GAS PROPERTIES, INC.; JON H. MARPLE;
MARY E. BLAKE; JON R. MARPLE; GRATEFUL
INTERNET ASSOCIATES, LLC, a Colorado limited
liability company; DIVERSIFIED FINANCIAL
RESOURCES CORPORATION, a Delaware corporation;
JOHN CHAPMAN; VALESC HOLDINGS, INC., a New
Jersey corporation; JEREMY D. KRAUS; SAMUEL
COHEN; NCI HOLDINGS, INC., a Nevada corporation,

DEFENDANTS.

---

Judge Dale A. Kimball
DECK TYPE: Civil
DATE STAMP: 10/16/2003 @ 09:04:28
CASE NUMBER:  2:03CV00914  DAK

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint alleges as follows:

## OVERVIEW

1.     The Defendants collectively engaged in a massive scheme to defraud foreign investors of more than $16 million. The Defendants deceived investors into believing that the investors were investing in small United States companies.

2.     Defendants sold shares in five microcap companies to investors located primarily in the United Kingdom.

3.     Defendants lied to investors about the companies they promoted, and kept the vast majority of investor funds for themselves, allowing only a miniscule amount of the funds to go to the companies they promoted.

4.     Some principals of the small companies also mislead investors and manipulated the price of their companies in order to make it appear that the stock price of the company was increasing. In reality, the increases in share price were attributable to purchases and sales by company insiders or other Defendants.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 [15 U.S.C. §§ 77t and 77v] and Sections 21 and Section 27 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u and 78aa].



6.     Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts, and courses of business alleged herein, certain of which have occurred within the District of Utah.

7.     Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this complaint took place in this District, and because certain of the defendants reside in and transact business in this District.

8.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and course of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANTS

9.     David M. Wolfson, 24, of Salt Lake City, Utah, is President of NuWay Holding, Inc, and controls Momentous Group, LLC and Leeward Consulting Group, LLC.

10.    NuWay Holding, Inc. is a Utah corporation based in Salt Lake City and controlled by David Wolfson.

11.    Momentous Group, LLC is a Utah limited liability company based in Salt Lake City, Utah and is controlled by David Wolfson. He is its sole member.

12.    Leeward Consulting Group, LLC is a Utah limited liability company based in Salt Lake City, Utah and is controlled by David Wolfson

13.    Gino Carlucci, 25, of Salt Lake City, Utah and Arizona, controls G & G Capital, LLC, and is the former President of NCI Holdings, Inc. Carlucci

served as the escrow agent for several issuers who offered their stock through Sukumo Limited.

14. G & G Capital is a Utah and Arizona limited liability company that operates from Salt Lake City, Utah and Mesa, Arizona. Carlucci controls G & G Capital.

15. Sukumo Limited (a.k.a. The Sukumo Group, The Fujiwara Group, First Chartered Capital Corporation, First Colonial Trust, First China Capital, International Investment Holding) is a British Virgin Islands corporation that appears to be operating out of Thailand and Lao, People's Democratic Republic ("Laos"). Sukumo marketed the stock of Stem Genetics, Inc., F10 Oil & Gas Properties, Inc., Diversified Financial Resources Corporation, Valesc Holdings, Inc., and NCI Holdings, Inc. to overseas investors in the United Kingdom, Australia, and New Zealand.

16. Michael Sydney Newman (a.k.a. Marcus Wiseman), apparently a citizen of the United Kingdom living in Thailand or Laos, is the President of Sukumo and its numerous related entities.

17. Stem Genetics, Inc. is a Nevada Corporation headquartered in Salt Lake City. Stem Genetics offered its stock to foreign investors through Sukumo.

18. Howard H. Roberton, M.D., Salt Lake City, Utah, is the new President of Stem Genetics.

19. F10 Oil & Gas Properties, Inc. is a Nevada corporation with offices in Willis, Texas and Newport Beach, California. F10 offered its stock to foreign investors through Sukumo.

20. Jon H. Marple, 63, of Willis, Texas and Newport Beach, California, was President of F10 until July 23, 2003, when he resigned and was replaced

by Charles Blake, his brother-in-law. Jon H. Marple is now a consultant to F10.

21.    Mary E. Blake, 50, also of Willis, Texas, and Newport Beach, California, is Jon H. Marple's wife and Chief Financial Officer of F10.

22.    Jon R. Marple, of Colorado Springs, Colorado, is the President of Grateful Internet Associates, LLC, a Colorado limited liability company, and the son of Jon H. Marple.

23.    Diversified Financial Resources Corporation is a Delaware Corporation based in San Diego, California and Salt Lake City, Utah. Diversified offered its stock to foreign investors through Sukumo.

24.    John Chapman, 61, of San Diego, California, and Salt Lake City, Utah, is the President of Diversified.

25.    Valesc Holdings, Inc. is a New Jersey corporation based in Addison, Texas. Valesc offered stock to foreign investors through Sukumo.

26.    Jeremy D. Kraus, of Addison, Texas, is Chairman and CEO of Valesc.

27.    Samuel Cohen, of New York, New York, is President of Valesc.

28.    NCI Holdings, Inc. is a Nevada corporation headquartered in Salt Lake City, Utah. Until early September 2003, Carlucci was President of NCIH. While Carlucci was President of NCIH, NCIH offered stock to overseas investors through Sukumo.

## DEFINITIONS

29.    "Boiler Room": A business operation in which sales people, working off lists, make cold calls over the telephone to potential purchasers of securities and, using prepared scripts and high pressures sales tactics, sell securities to investors at inflated prices and/or for high commissions that are not disclosed as such to potential investors.

30.    "Issuer": A public company offering securities to the public market.

31.    "OTC Bulletin Board" ("OTCBB"):  is a regulated quotation service that
       displays real-time quotes, last-sale prices, and volume information in over-
       the-counter ("OTC") equity securities.  An OTC equity security generally
       is any equity that is not listed or traded on Nasdaq® or a national securities
       exchange.  OTCBB securities include national, regional, and foreign
       equity issues, warrants, units, American Depositary Receipts, and Direct
       Participation Programs.

32.    "Shell":  An inactive corporation with few or no assets that has no
       business activity.

## INTRODUCTION

33.    Since in or about October 2002, Wolfson and Sukumo, a boiler room
       apparently operating from Thailand and Laos, have conducted an unlawful
       scheme to mislead and defraud more than one thousand overseas
       investors, located primarily in the United Kingdom, through the sale of
       stock in Stem Genetics, F10, Diversified, Valesc, and NCIH.

34.    Starting in at least February 2003, Carlucci joined Wolfson's and
       Sukumo's unlawful scheme to mislead and defraud overseas investors
       through the sale of stock in Stem Genetics, F10, Diversified, Valesc, and
       NCIH.

35.    More than $16.3 million has been raised through these overseas offerings
       from January 1, 2003 through September 30, 2003.

36.    After locating companies that wished to raise money through an overseas
       offering (such as F10, Diversified, and Valesc), or forming their own
       companies (Stem Genetics and NCIH), Wolfson, Carlucci, and entities
       controlled by them, have arranged an Offshore Stock Purchase Agreement
       ("Offshore Agreement") between the companies and Sukumo, whereby

Sukumo ostensibly has agreed to purchase up to 10 million shares of each
issuer's stock, usually for 30% of the bid price.

37.     Despite the language in the Offshore Agreements, Sukumo never
purchased the stock from the issuers and never assumed the risk that it will
not be able to resell the stock to overseas investors.

38.     Instead, Sukumo acted as a sales agent for the issuer.  Sukumo's brokers
cold called potential investors and provided follow-up information to the
potential investors through e-mail or facsimile transmissions, including
wire transfer information so that investors could wire their money to
escrow accounts in the United States.

39.     For performing these services, Sukumo received 70% of the investor
funds.

40.     Once an investor verbally agreed to purchase shares through Sukumo,
Sukumo sent a Trade Confirmation to the investor by e-mail or by
facsimile.  The Trade Confirmation lists the name of the company, the
number of shares that the investor has agreed to buy, the price per share,
the sub-total for the shares, the commission, and the total price for the
transaction.  The Trade Confirmations generally list a 2% commission for
Sukumo, although some brokers gave investors discounted commissions
of 1% or no commission at all.

41.     Investors do not wire their funds to Sukumo, but rather to escrow accounts
in Salt Lake City, Utah, Mesa, Arizona, or Phoenix, Arizona.  The escrow
accounts are opened by Carlucci or by Wolfson's employees.  Carlucci
and Wolfson's employees then serve as the escrow agents for the
accounts.

42.     Sukumo sends a Stock Purchase-Floor Transaction Confirmation Receipt
("Confirmation Receipt") to the investor by e-mail or facsimile.  The



Confirmation Receipt also falsely states that Sukumo is receiving a 2% commission.

43.    Wolfson and Carlucci saw multiple copies of investor Trade Confirmations and/or Confirmation Receipts.

44.    Sukumo representatives have telephoned Wolfson, Carlucci, and the escrow agents several times a week to discuss the flow of money into the escrow accounts.

45.    The escrow agents take the investors' contact information from the Confirmation Receipt and instruct the issuers' transfer agents to issue stock certificates to the investors from the 10 million shares issued to Sukumo.  Once the transfer agents issue stock certificates to the investors and issue new certificates to Sukumo for the balance, the escrow agents mail the stock certificates bearing the Regulation S restriction legend to the overseas investors.

46.    The escrow agents have distributed the invested funds among Sukumo, the issuer, and entities controlled by Wolfson, generally keeping a small portion of the funds for themselves as escrow fees.  After the escrow fees have been deducted, Sukumo received 70% of the invested funds, and the remaining 30% has been divided between the issuer and Wolfson's entities based on a Finder's Agreement.

47.    Sukumo's 70% share of the proceeds are wired to off-shore bank accounts in Laos.

48.    Sukumo intentionally misleads investors about:

(a)  Sukumo's Sales Commission.  The statements sent to investors reflect the commission is only 2%.  Sukumo does not disclose to investors that it receives a 70% commission.



(b)  Restricted Shares.  Sukumo also tells investors that the shares they are purchasing are free-trading shares and fails to disclose to investors that their shares are restricted shares.

(c)  Business Developments.  Sukumo regularly misrepresents facts about the operations and prospects of the companies it is marketing.

49.     Sukumo has been selling shares to investors at or slightly below the market price for the security as quoted on the OTCBB.  Wolfson and certain individuals affiliated with the issuers, however, have been manipulating the market price for F10, Diversified, and Valesc stock through open market purchases of the stock.  Sukumo encourages potential investors to check the quoted price for the issuers' stock.  The sole exception to this practice has been Stem Genetics, which has never traded publicly.

## THE SCHEME TO DEFRAUD

A.    **WOLFSON'S, SUKUMO'S, AND CARLUCCI'S ACTIONS TO DEFRAUD INVESTORS**

50.     David Wolfson is the President of NuWay.  As detailed at length below, he arranged for a number of microcap companies, among them F10, Diversified, Valesc, and NCIH, to use Sukumo to market shares of those companies through Regulation S distributions to foreign investors.  The issuers located by David Wolfson have few or no operations, but were interested in selling securities to raise capital.

51.     As President of NuWay, David Wolfson arranged for these issuers to offer large blocks of stock to Sukumo, which then sells the securities to foreign investors for a 70% commission from the proceeds.  Wolfson or entities



controlled by him take between 15% to 20% of the proceeds, and the issuers receive the remaining 15% or less.

52.     Acting singly or in concert with others, NuWay employees drafted the Offshore Agreements between the issuers and Sukumo, and the Finder's Agreements between the issuers and Wolfson and his entities. Wolfson retains NuWay employees and others to serve as escrow agents. The escrow agents manage the accounts into which the offering proceeds are wired, distribute the offering proceeds, cause Confirmation Receipts to be sent to the investors, and deliver stock certificates to investors.

53.     Sukumo solicits investors located primarily in the United Kingdom, Australia, and New Zealand via telephone to purchase securities in a number of companies.

54.     Sukumo provides more detailed information regarding the issuers by e-mail or facsimile to investors who express an interest, and then follows-up with high-pressure sales techniques. Sukumo primarily has offered investors securities that are quoted on the OTCBB, although it has also pitched shares of Stem Genetic, which was characterized as "pre-IPO" stock.

55.     Newman signs the Offshore Agreements with the issuer on behalf of Sukumo and its aliases, including First Chartered Capital Corporation ("First Chartered"), First Colonial Trust ("First Colonial"), First China Capital ("First China"), and International Investment Holding. Newman signed the Offshore Agreement with F10 as M. Wiseman.

56.     By the end of March 2003, Carlucci was working as the escrow agent for Diversified and Stem Genetics and intending to work as the escrow agent for Valesc.

57.     On or about March 14, 2003, Carlucci opened an account at a Bank One

branch in Mesa, Arizona under G&G Capital's name for use as the Stem

Genetics Escrow Account. On or about March 17, 2003, Carlucci

incorporated Valesc Escrow, LLC in Arizona. On or about March 19,

2003, Carlucci opened an account under Valesc Escrow, LLC, at AmTrust

Bank. On or about March 21, 2003, Carlucci opened an account for

Diversified Financial Resources LLC ("Diversified Escrow") at

Washington Mutual in Phoenix, Arizona. On or about April 3, 2003,

Carlucci opened another account for Diversified Escrow at Bank One in

Mesa, Arizona. Investors directed funds to both of these accounts, and

Carlucci made disbursements from both accounts.

58.     By or about April 2003, Carlucci was working in Salt Lake City, Utah at

the extra desk in David Wolfson's NuWay office. Wolfson and Carlucci

collaborated on a number of projects, including projects related to

Sukumo.

59.     Although on paper Carlucci was just the escrow agent for Diversified and

Stem Genetics, in or about mid-May 2003, Carlucci traveled to the

Cayman Islands at the request of Newman to set up accounts for Newman.

The tickets to the Cayman Islands were paid for out of investor funds

wired to the Diversified Escrow account.

60.     On or about May 22, 2003, Carlucci opened two more accounts at Bank

One in Mesa, Arizona. The first account was a corporate account for

NCIH. The second was an escrow account for NCIH that had Carlucci

and his friend, Jeff Cancilla, listed as signatories.

61.     Cancilla served as the escrow agent for NCIH, although the bank

statements for the escrow account went to Carlucci's post-office box in

Arizona. In addition to his role as the esrow agent for NCIH, Cancilla also

11

worked as the escrow agent for F10.  At some point, Cancilla moved to
Salt Lake City, Utah and works as a NuWay employee.

62.     In or about late May 2003, Carlucci traveled with Wolfson to Thailand
and Laos, ostensibly to meet Newman for the first time.  Upon his return
from his meeting with Newman, Carlucci executed an Offshore
Agreement with Sukumo as President of NCIH.

63.     In or about August 2003, Carlucci and Wolfson traveled back to Thailand
and Laos ostensibly at their own initiative to meet again with Newman and
Sukumo.  After their return, the escrow agents for the issuers were
directed to wire Sukumo's funds to a new bank account in the name of
International Investment Holding at the Vientiane branch of the Laos-Viet
Bank.

**B.      STEM GENETICS**

64.     In or about April 2002, Allen Wolfson, David Wolfson's father, created a
Nevada shell corporation named Stem Genetics.  Contary to the
representations made on its website and in its filings with the Commission,
Stem Genetics has never had researchers, research space, research plan,
nor were its officers aware of any research conducted by or on behalf of
the company.

65.     Stem Genetics executed three Offshore Agreements with Sukumo—one
with First Chartered in April 2002, one with Sukumo in May or June
2002, and one in July 2003.  Stem Genetics did not disclose these
agreements or its plans to sell Regulation S stock in its Form SB-2 filings.
Rather, when describing its plan of distribution in its July 17, 2002 filing
and its August 2, 2002 amended filing, Stem Genetics stated that it
planned to sell a maximum of 1,500,000 shares of Stem Genetics through



Robert Youngblood, Stem Genetics' nominal President, on a "self-underwritten" basis, without any selling agents.

66. Stem Genetics did not file a Form 8-K to announce its Offshore Agreement with Sukumo to sell stock.

67. Sukumo marketed the shares of Stem Genetics to investors in the United Kingdom.

68. Sukumo misrepresented the following facts about Stem Genetics:

(a) The amount of commissions received. Sukumo representatives told investors that Sukumo would receive a 1% or 2% commission. Instead, Sukumo received 70% of the share price.

(b) The initial "float" price. Investors were told that the shares when listed would sell for $7.00 or more per share. Investors were told they could purchase shares in a "pre-IPO" deal for $5.75. There was never to be initial public offering ("IPO") of Stem Genetic shares. Instead, Stem Genetics was effecting a Regulation S offering to foreign investors through Sukumo.

(c) The business operations of Stem Genetics. Sukumo representatives directed investors to the Stem Genetics website and to false filings with the Commission and told investors that Stem Genetics had received a substantial research grant from the United States government, that it had substantial research and scientific resources, and that it was actually engaged in stem cell research. These statements were false. Stem Genetics was nothing more than a shell company without resources.

69. Stem Genetics has raised more than $5 million through its offering as of June 30, 2003.



70. Of that amount, Sukumo has received more than $4 million. Stem Genetics has received approximately $761,000. David Wolfson has received approximately $78,000 personally or through entities controlled by him.

71. Although there have been nominal presidents at the helm of Stem Genetics since its inception, the company has at all times been controlled and operated by Allen Wolfson or David Wolfson.

72. Starting in at least December 2002, David Wolfson worked side by side with his father Allen Wolfson, who was about to face trial on criminal securities fraud charges in New York and who was transferring a number of his business deals to David Wolfson to run while Allen Wolfson served possible prison time.

73. After Allen Wolfson left Salt Lake City, David Wolfson re-named his father's company, Feng Shui Consulting, Inc. ("Feng Shui") as NuWay, and relocated the offices.

74. Stem Genetics was one of the companies formerly associated with Feng Shui that David Wolfson transferred to NuWay.

75. David Wolfson knew that Stem Genetics had no operations, no researchers, no facilities, and had taken no steps to develop operations, researchers or facilities. David Wolfson also knew that since in or about October 2002, Sukumo had been selling shares in Stem Genetics to overseas investors pursuant to the Offshore Agreement negotiated by his father. Indeed, through entities controlled by him, Wolfson was receiving $0.50 for every share of Stem Genetics stock by Sukumo. Wolfson's entities received the disbursement from the escrow accounts in Salt Lake City and Mesa, Arizona to which investors wired their money.




76.    In or about May or June 2002, Robert Youngblood agreed to serve as the President of Stem Genetics as a favor to his long-time friend Allen Wolfson. Youngblood was the nominal President of Stem Genetics but did not do anything as the President of Stem Genetics and his name was not on the corporate bank account. On or about March 3, 2003, Youngblood resigned from his position as President of Stem Genetics.

77.    Upon Youngblood's resignation in or about early March 2003, David Wolfson asked Laura Henderson, NuWay's paralegal, to serve as Stem Genetics' President. Henderson drafted the documents that Wolfson requested and signed documents that he provided to her.

78.    David Wolfson opened two new Stem Genetics accounts in April 2003 at Community First Bank in Salt Lake City, Utah. Wolfson and a NuWay employee that he appointed as a director of Stem Genetics had signature and withdrawal authority over both Stem Genetics accounts. Henderson did not.

79.    In early June 2003, Henderson resigned her paralegal position at NuWay and her position as President of Stem Genetics. Wolfson did not replace her until July 2003, when he interviewed and hired Robertson as the new President of Stem Genetics.

80.    Robertson does not have any experience with designing, overseeing, or conducting medical research.

81.    In or about July 2003, Wolfson directed Robertson to sign a Consulting Agreement between Stem Genetics and NuWay that was retroactive to April 2003, and that retroactively justified as compensation certain funds that Wolfson had taken from Stem Genetics' corporate account.



82.    In or about July 2003, Wolfson had Robertson execute a new Offshore Agreement with Sukumo that made up to 10 million additional shares available for Sukumo's purchase.

83.    Although he did not draft the text for the new Stem Genetics website, Robertson reviewed the website text and made small changes to it. Robertson knew that the website stated that Stem Genetics was conducting research, and that the website stated that there were researchers at Stem Genetics who had made discoveries with adult stem cells.

84.    Robertson knew that potential and actual investors were visiting the website and relying upon the information contained on the website because he has spoken with a number of investors who reached him with the contact information provided on the website.

85.    When he spoke by telephone to the investors who called him, Robertson told the investors that Stem Genetics was a company with ongoing operations.

86.    Robertson also posted a message to the UK investors on an investors' message board. Robertson's posted message to investors refers them to Stem Genetics' website, states that the website is accurate, and states that Stem Genetics registration statement was withdrawn because it was misleading.

87.    Robertson received at least $13,000 to move from Pine, Arizona to Salt Lake City, Utah so that he could devote himself to Stem Genetics full-time.  He appointed his wife, Jami Robertson, as Vice-President of Stem Genetics and charged her with the details of running the business, despite her lack of any scientific or research experience and her failure to graduate from high school.  She receives at least $2,000 a month from the company.

88.     From in or about April 2002, Stem Genetics has had active websites. The first website had a link to Stem Genetics' filings with the Commission. Stem Genetics' filings were registration statements on Form SB-2 that misrepresented the company's research and the structure of Stem Genetics' relationship with Sukumo. The first website was active until on or after June 13, 2003, when David Wolfson replaced it with a new website, designed by a NuWay employee.

89.     Both websites affirmatively misrepresent the management of Stem Genetics by listing the names and curricula vitae various Scientific Advisory Board members, as if the company had a functioning advisory management team. The first website affirmatively misrepresented Youngblood as the President of Stem Genetics after he had resigned.

90.     Both websites affirmatively misrepresent Stem Genetics as a company with on-going research, researchers, and discoveries.

**Stem Genetics Filings with the Commission**

91.     On July 18, 2002 Stem Genetics filed a registration statement on Form SB-2 with the Commission; an amendment to the registration statement was filed on August 7, 2002.[1]  On the second and third pages of both of its filed registration statements, Stem Genetics falsely stated that it was currently conducting research focused on new storage techniques, research techniques, therapies, and produces based on the company's genetic discoveries with adipose stem cells. Stem Genetics also falsely stated that the potential for stem cells in tissue engineering and restorative treatment such as reconstructive and cosmetic surgery was of particular focus to its researchers, and that it provided cutting edge genetic research.

---

[1]     The registration statement was withdrawn on April 15, 2003, without having gone effective.

92.    Stem Genetics did not conduct research, had not made genetic discoveries with adipose stem cells, did not have any researchers, and its officers were never aware of any research conducted by or on behalf of the company. In its filings, Stem Genetics failed to disclose its Offshore Agreements with First Chartered and Sukumo and its Finder's Agreement with Feng Shui and/or entities controlled by David Wolfson. Stem Genetics did not file a Form 8-K to disclose the Offshore Agreements or the Finder's Agreement.

## C.    F10 OIL & GAS PROPERTIES

93.    On or about December 18, 2002, F10 entered into an Offshore Agreement to sell Sukumo up to 10 million shares of F10 stock at 30% of the bid price for F10 stock. Jon H. Marple signed the agreement for F10 and M. Wiseman signed as the President and CEO of Sukumo.

94.    Jon R. Marple introduced his father, Jon H. Marple, and F10 to Wolfson and NuWay, who, in turn, made the connection with Sukumo. In return for those introductions, F10 paid Jon R. Marple through his company Grateful Internet 10% of the funds that it received from the Sukumo offering. The money has been wired to Grateful Internet directly from an escrow account established on its behalf. These payments were not disclosed until the filing of F10's Form 10KSB, at least seven months after Sukumo began selling F10 shares.

95     In or about December 2002, F10, Feng Shui, and Leeward entered into a Finder's Agreement whereby a total of 17.5% of the bid price would be paid to Feng Shui and Leeward. This Finder's Agreement was amended in or about March 2003 to give 17.5% of the bid price to NuWay. The amended agreement was filed as an exhibit to F10's July 11, 2003 10-KSB filing.

96.     The agreement between F10 and NuWay states that NuWay will provide
certain merger and acquisition services to F10.  Nowhere in the
agreement, or in the F10 July 11, 2003 Form 10-KSB itself, is there any
disclosure that Wolfson and NuWay would engage in a program of
purchasing F10 shares in conjunction with sales of stock by Grateful
Internet to support the price of F10 stock.

97.     The Offshore Agreement between F10 and Sukumo was also attached as
exhibits to F10's July 11, 2003 Form 10-KSB filing.  The Offshore
Agreement is misleading in that it states Sukumo is buying the shares for
its own account or for accounts over which it has discretionary authority.

98.      In or about July 2003, F10's new escrow agent, Jeff Cancilla, opened a
new F10 escrow account at Wells Fargo's Gateway branch.  In late July
2003, investors started wiring their funds to the new account.
Distributions to F10, NuWay, Grateful Internet Associates, and Sukumo
were made from the account.  On or about August 29, 2003, Sukumo
received its share into a new account in the name of International
Investment Holding, maintained at the Vientiane branch of the Lao-Viet
Bank.

99.     Also on or about August 29, 2003, Cancilla directed a $43,000 payment to
G & G Capital from F10's escrow account.  On or about September 4,
2003, Cancilla directed a $12,000 payment to G & G Capital from F10's
escrow account.  On or about September 12, 2003, Cancilla directed a
$302298.44 payment to G & G Capital from F10's escrow account.  F10
did not disclose these disbursements to G & G Capital.

100.    From the time Sukumo started offering F10's stock to overseas investors
through September 30, 2003, more than $5.8 million flowed through the
F10 escrow accounts in Salt Lake City, Utah.  Sukumo received

approximately $2.2 million from the sale of F10 stock. F10 only received 12.5% of the sales price of the stock sold on its behalf by Sukumo.   As of September 30, 2003, F10 had received approximately $695,000 from the offering of its stock.

101.   In contrast, Nu Way has received approximately $990,000 from the offering.

102.   Jon H. Marple and Jon R. Marple knew that Sukumo never purchased the stock from F10 and that Sukumo acted as an agent of F10 to sell F10 stock to foreign investors for a 70% commission.   Jon H. Marple and Jon R. Marple also knew that the Wolfson-related entities received a total of 17.5% of the proceeds.

103.   Jon H. Marple entered into these arrangements with Sukumo and Wolfson's entities because his company needed the money and F10 would have been forced into bankruptcy without an influx of cash.   Jon H. Marple and Blake used F10's corporate account, however, for their personal benefit.   At the time that F10 supposedly was in dire need of money, Jon H. Marple and Blake, each were receiving approximately $10,000 a month in compensation from F10 pursuant to employment contracts signed on February 1, 2002.   In addition, Jon H. Marple and Blake used funds in F10's corporate account to pay various personal credit cards and F10 paid Jon H. Marple's medical expenses that, over a period of several months, totaled at least $18,000.

**F10's False Filings with the Commission**

104.   On February 14, 2003, F10 filed a Form 10-QSB with the Commission for the quarter ended December 31, 2002. The disclosures in this filing were minimal. The only disclosure made in that filing regarding its agreement with Sukumo was that F10 had issued 10 million shares of stock to



Sukumo. The filing on Form 10-QSB stated F10 would receive approximately 12.5% of its bid price per share, that the agreement had been signed on December 10, 2002, and that no shares had been sold as of December 31, 2002. The filing on Form 10-QSB stated that F10 started receiving funds in January 2003.

105. F10's filing on Form 10-QSB with the Commission does not disclose that Sukumo keeps 70% of the proceeds as commission.

104. F10 does not disclose in its February 14, 2001 filing on Form 10-QSB that it had entered into an agreement with Jon R. Marple and Grateful Internet to pay them 10% of the proceeds F10 received from Sukumo in return for Jon R. Marple's introduction of his father, Jon H. Marple, to Wolfson.

105. There was no disclosure on Form 10-QSB that Wolfson's entities were keeping a total of 17.5% of the offering proceeds.

106. Jon H. Marple, as CEO, and Mary E. Blake, as CFO, certified the Form 10-QSB filing.

107. In its Form 10-KSB for the year ended March 31, 2003, which was filed on July 11, 2003, several weeks after F10 had received investigative subpoenas from the Commission, the company dramatically changed its disclosure. This filing on Form 10-KSB finally discloses the relationship with Grateful Internet and the payments to the Wolfson entities.

108. The Form 10-KSB states that Sukumo is purchasing stock from F10, when it is not, and fails to disclose Sukumo was receiving 70% of the sales price of the stock as commission. The Form 10-KSB was signed and certified by Jon H. Marple, as CEO, and Blake, as CFO.

109. On September 5, 2003, F10 filed a Form 8-K with the Commission to announce that it had provided notice to Sukumo of its intent to terminate



the agreement.  F10 established 30 days to complete any on-going transactions.

**Manipulation of F10's Stock Price**

110.   From January 2003, when Sukumo started selling F10 stock, through September 2003, a total of 23,400 shares of F10 stock were traded at prices ranging from $1.30 to $2.25 a share.  Most of the retail trading involved sales of stock by Jon R. Marple through Grateful Internet and matching purchases of the shares by David Wolfson through Momentous.

111.   From March 1, 2003, through July 9, 2003, only 1,892 shares were purchased in retail transactions; all of those purchases were by Wolfson trading for the account of Momentous.  During that same period, Jon R. Marple, trading through Grateful Internet, sold 1,750 shares, or virtually all the retail selling.  Most of Jon R. Marple's sales were on the same day as Wolfson's purchases.

112.   Wolfson and Marple placed matched orders to manipulate the price of F10 stock at a time when Sukumo was aggressively marketing F10 shares to overseas investors at prices tied to the quoted prices of F10 stock on the OTCBB.

**C.   DIVERSIFIED**

113.   Diversified's relationship with Sukumo is reflected in two series of agreements.  The first series of agreements is dated on or about March 21, 2003.  The Offshore Agreement with Sukumo stated that Sukumo would purchase up to 10 million shares of stock from Diversified for 30% of the bid price.  Chapman, Carlucci, and Sukumo signed an Escrow Agreement dated March 27, 2003 pursuant to which Carlucci agreed to serve as the Escrow Agent for sales of stock to Sukumo.  Momentous and Nuway were

to receive a total of 13% of the proceeds.  NuWay ultimately receives approximately 15% of the proceeds.

114.   On or about February 9, 2003, Carlucci, on behalf of Diversified Escrow, an Arizona limited liability company that he incorporated, signed a Confidentiality Agreement with Chapman to cover discussions with Chapman about serving as the escrow agent for Diversified's anticipated Offshore Agreement with Sukumo.

115.   By the end of March 2003, investors were wiring funds into the Diversified Escrow account that Carlucci opened at Washington Mutual in Phoenix, Arizona. On or about April 14, 2003, Carlucci made the first wire transfer from the Diversified Escrow account at Washington Mutual to Newman's account at Thai Military Bank.

116.   On or about April 29, 2003, the first investor wired funds into the Diversified Escrow account that Carlucci opened at Bank One in Mesa, Arizona.  On or about May 22, 2003, Carlucci made the first wire transfer from the Bank One account to Newman's account at Thai Military Bank.

117.   In addition to making disbursements to Diversified's corporate account and to NuWay, Carlucci made several transfers to David Wolfson's personal accounts.

**Diversified's Filings with the Commission**

118.   Despite the fact that Sukumo began selling Diversified stock at the end of March 2003, Diversified failed to disclose the existence of the Sukumo Offshore Agreement and the Finder's Agreement, and the ongoing sales of its stock in a Form 10-KSB filed on April 18, 2003, and a Form 10-QSB filed on May 15, 2003.  Chapman signed and certified both filings.

119.   On May 23, 2003, two days after Diversified re-executed the agreements with Sukumo, Diversified filed a Form 8-K with the Commission to

23

disclose the terms of the new Offshore Agreement with Sukumo.  The

filing did not disclose that Sukumo was not actually purchasing the stock.

120.    The Form 8-K failed to disclose that Sukumo had already been selling

Diversified stock to overseas investors for nearly two months.  The Form

8-K did not disclose that David Wolfson was receiving funds from the

escrow account, or that NuWay would be receiving funds from the escrow

account.

121.    Diversified's disclosures misrepresent the company's actual arrangement

with Sukumo.  Contrary to the representations in Diversified's filings,

Sukumo did not purchase stock from Diversified and then resell it to

investors.  Rather, Sukumo solicited investments and received a 70%

commission that was only paid to Sukumo after Carlucci received funds

from investors and Trade Confirmations and/or Confirmation Receipts

from Sukumo.

122.    On June 19, 2003, Diversified amended its escrow agreement with

Diversified Escrow to increase Carlucci's fee from .05% of the funds paid

into the escrow account by investors to 6% of the funds for serving as

Diversified's escrow agent.  This increase in the escrow fee was

negotiated to enable Carlucci to pay his legal fees connected to the

Commission's investigation.  Although Diversified filed three Forms 8-K

and one Form 10-KSB with the Commission after the change in the

escrow agreement, the increased fee to Carlucci was never disclosed.

**Manipulation of Diversified's Stock Price**

123.    From March 20, 2003, when Diversified signed its Offshore Agreement

with Sukumo, a total of 30,200 shares of Diversified stock were traded at

prices ranging from $1.01 to $2.65 a share.



124. The total volume of Diversified's stock sales from February 2003 through July 31, 2003, was 14,000 shares. All the retail trading in the stock involved purchases by Chapman through an account he controlled at Des Jardins Securities in Montreal.

125. All of these purchases were made from Newbridge Securities in Boca Raton, Florida. Newbridge had an arrangement with Chapman whereby it would purchase any Diversified stock that came on the market and would then sell the stock to Des Jardins.

126. Chapman purchased any stock that came on the market through the trading account that he controlled at Des Jardins.

127. Chapman, the president of Diversified, manipulated the price of Diversified at a time when Sukumo was aggressively marketing Diversified shares to overseas investors at prices tied to the quoted prices on the OTCBB. Diversified never disclosed Chapman was manipulating the price of the company's stock.

## D.   VALESC

128. In January 2003, Wolfson, through Momentous and Leeward, helped Valesc orchestrate an offering of up to 10 million shares of its common stock to overseas investors through a Sukumo alias, First Chartered. Newman signed the Offshore Agreement with Valesc as the CEO of First Chartered. Cohen executed the agreement on January 10, 2003, as the President of Valesc.[2] Under the agreement with First Chartered, Valesc was to receive 30% of the bid price of the stock on the day of purchase.

---

[2]      There is some discrepancy as to which entity was actually a party to the agreement because the Offshore Agreement is between Valesc and First Chartered, but in its filings with the Commission Valesc discloses an agreement as with First China Capital, Inc., ("First China") also allegedly a Chinese corporation based in Beijing.

129.    On January 10, 2003, Valesc entered into a Finder's Agreement with Momentous and Leeward whereby Valesc agreed to give Momentous and Leeward each 33% of the funds that Valesc received pursuant to the Offshore Agreement. Therefore, after Sukumo received its 70% share, Valesc received less than 10% of the proceeds.

130.    Valesc has never disclosed the agreement between Valesc, Momentous and Leeward.

131.    As with the Offshore Agreements with Stem Genetics, F10 and Diversified, the transaction is described as if First Chartered is buying Valesc's stock for 30% of the bid price, when, in fact, First Chartered was acting as a sales agent for Valesc and being paid a 70% commission once Valesc's escrow agent received funds from foreign investors solicited by First Chartered.

**Valesc's Filings with the Commission**

132.    On or about April 15, 2003 Valesc filed its Form 10-KSB with the Commission and disclosed that on January 22, 2003, it had entered into an arrangement with First China Capital, Inc. ("First China"), a Chinese corporation based in Beijing, whereby First China was authorized to purchase up to 10 million shares of Valesc's common stock for 30% of the bid price as reflected on the OTCBB on the date of purchase; in fact the agreement was actually entered into with First Chartered.

133.    The filing does not disclose that First China receives a 70% commission for selling the shares. Nor does the filing make any disclosure regarding the agreements between Valesc and Momentous and Valesc and Leeward pursuant to which approximately two-thirds of the funds received by Valesc under the agreement with First China have been paid to entities

controlled by Wolfson.  The Form 10-KSB was signed and certified by both Kraus and Cohen.

134.  On September 2, 2003, Valesc filed a Form 10-QSB/A in which it reiterated this brief disclosure about its agreement with First China and updated the revenues received pursuant the agreement.  As of June 30, 2003, it stated that it had received net proceeds of approximately $105,800.  Again, there was no disclosure on Form 10-QSB/A that First China was being paid a 70% commission for acting as a sales agent for Valesc and that as of June 30, 2003 more than $1 million had been wired to Valesc's escrow account.  Also, Valesc again failed to disclose its payments to Momentous and Leeward.  Kraus and Cohen certified the filing.

**Manipulation of Valesc's Stock Price**

135.  From May 1, 2003, through July 31, 2003, a total of 42,700 shares of Valesc common stock were traded on the OTCBB at prices ranging from $.70 to $1.20 a share.  At least half of this trading involved wholesale transactions between brokerage firms.

136.  During this time, which coincided with the overseas distribution being effected by First Chartered/First China, Kraus purchased 7,950 shares and Cohen purchased 6,800 shares for a total of 14,750 Valesc shares.  These purchases typically took place when the price of Valesc stock had fallen somewhat, and these trades nearly always resulted in an increase in the price of Valesc stock.

137.  For example, on July 25, 2003, the price of Valesc stock was $.75 a share. After purchases of 200 shares on July 28 and 200 shares on July 30, the price of the stock increased to approximately $1.10 a share for the next five days.  A month later, when the price dropped to $.76 a share on

September 5, purchases of 300 shares, 1200 shares and 500 shares on the next three trading days brought the price back up to approximately $1.10.

138.   Again, on September 23, when the price of Valesc stock fell to $.85 a share, purchases of 100 shares and 600 shares on the next two trading days brought the price of the stock back up to $1.10 a share.  Through these purchases, the price of Valesc stock was maintained at around $1.10 a share, which was the approximate price at which First Chartered/First China sold the shares to overseas investors.

139.   Since the price paid by overseas investors was tied to the quoted bid price for the stock, Kraus and Cohen's purchasing activity has resulted in more money flowing to Valesc from Sukumo's sales.  Potential investors have not been told that Valesc's stock price is being manipulated by Kraus and Cohen at the same time Valesc is benefiting from the overseas distribution of Valesc shares.

**E.   NCIH**

140.   Carlucci aquired NCI Holdings, Inc., formerly Vector Holdings Corp., in early 2003.  Carlucci was listed as the President, CEO, CFO, and/or Director of NCIH.

141.   On June 25, 2003, NCIH filed a Form 8-K with the Commission disclosing its June 24, 2003 Offshore Agreement with Sukumo.  NCIH does not disclose that Sukumo acts as a sales agent for NCIH, receives a 70% commission, and never actually purchases the stock.  Carlucci signed the Form 8-K as NCIH's CEO, President and Director.

142.   In its Form 10-QSB for the quarter ended June 30, 2003, filed on August 8, 2003, NCIH made a brief mention of Sukumo's right to purchase up to 10 million shares of the company's stock (without specifying the amount of the offering proceeds that ultimately would be disbursed to NCIH) and

referred to the June 25, 2003, Form 8-K filing.  Carlucci certified and signed the Form 10-QSB.

143.    By August 8, 2003, however, Carlucci knew that Sukumo was being paid 70% of the funds received from investors because the bank statements for the NCIH escrow account were sent to his post office box in Mesa, Arizona.  Those statements listed wire transfers from the escrow account to the Newman account at the Thai Military Bank amounting to 70% of the funds received.  Moreover, as the escrow agent for Diversified and Stem Genetics, Carlucci also knew that Sukumo received 70% of the proceeds in both of those deals.

144.    Carlucci knew that the disclosures in NCIH's filings omitted to disclose the actual compensation being paid to Sukumo for marketing NCIH's shares to investors.

145.    Carlucci also knew that Sukumo never purchased stock from the issuer for the purpose of reselling the stock.  Carlucci also knew that Sukumo acted as a sales agent that marketed the stock to foreign investors and was then paid a 70% commission by NCIH when investors wired funds into the escrow account.

### FIRST CAUSE OF ACTION

### EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
### Violation of Section 17(a)(1) of the Securities Act [15. U.S.C. § 77q(a)(1)]

146.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 145 above.

147.    Defendants, and each of them, by engaging in conduct described in Paragraphs 1 though 145 above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or



communication in interstate commerce or by use of the mails, with

scienter, employed devices, schemes, or artifices to defraud..

148.   By reason of the foregoing, Defendants, and each of them, directly or

indirectly, violated, and unless restrained and enjoined by this Court, will

continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. §

77q(a)(1)].

### SECOND CAUSE OF ACTION

### FRAUD IN THE OFFER AND SALE OF SECURITIES

### Violation of Section 17(a)(2) and 17(a)(3) of the Securities Act [15. U.S.C. § 77q(a)]

149.   The Commission realleges and incorporates by reference the allegations

contained in Paragraphs 1 though 145 above.

150.   Defendants, and each of them, by engaging in the conduct described in

Paragraphs 1 through 145 above, directly and indirectly, in the offer and

sale of securities, by the use of the means or instruments of transportation

or communication in interstate commerce or by use of the mails, obtained

money or property by means of untrue statements of material fact or by

omitting to state a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not

misleading, and engaged in transactions, practices, or courses of business

which operate or would operate as a fraud or deceit upon the purchaser.

151.   By reason of the foregoing, Defendants, and each of them, directly or

indirectly, violated, and unless restrained and enjoined will continue to

violate, Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§

77q(a)(2) and 77q(a)(3)].

## THIRD CAUSE OF ACTION

### FRAUD IN CONNECTION WITH THE PURCHASE
### AND SALE OF SECURITIES

**Violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]  and Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5]**

152.   The Commission realleges and incorporates by reference the allegations
contained in Paragraphs 1 though 145 above.

153.   Defendants, and each of them, by engaging in the conduct described in
Paragraphs 1 through 145 above, directly or indirectly, by the use of
means or instrumentalities of interstate commerce or use of the mails, in
connection with the purchase or sale of securities, with scienter, (1)
employed devices, schemes, or artifices to defraud; (2) made untrue
statements of material fact or omitted to state a material fact necessary in
order to make statements made, in light of the circumstances under which
they were made not misleading; or (3) engaged in acts, practices, or
courses of business that operated or would operate as a fraud and deceit
upon other persons.

154.   By reason of the foregoing, Defendants, and each of them, violated, and
unless restrained and enjoined will continue to violate Section 10(b) of the
Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §
240.10b-5].

## FOURTH CAUSE OF ACTION

### MANIPULATION

**Violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]  and Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5]**

155.   The Commission realleges and incorporates by reference the allegations
contained in Paragraphs 1 though 145 above.

156.   Defendants Wolfson, Momentous, Jon R. Marple, Grateful Internet, Chapman, Kraus, and Cohen, by engaging in the conduct described in Paragraphs 1 though 145 above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to sate a material fact necessary in order to make statements made, in light of the circumstances under which they are made not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon other persons.

157.   By reason of the foregoing, Defendants Wolfson, Momentous, Jon R. Marple, Grateful Internet, Chapman, Kraus, and Cohen violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CAUSE OF ACTION

### FALSE FILINGS WITH THE COMMISSION

**Violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 13a-13]**

158.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 145 above.

159.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 13a-13] thereunder, requires companies filing reports with the Commission to file reports that do not contain untrue statements

of material fact or omit material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

160.    Defendant F10 violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder by filing Form 10-QSB on February 14, 2003, Form 10-KSB on July 11, 2003, and Form 10-QSB on August 14, 2003. These filings contained untrue statements of material fact, were materially misleading, and omitted material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading. Unless restrained and enjoined by this Court, F10 will continue to violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

161.    Defendant Diversified violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by filing Form 10K-SB on April 18, 2003, Form 10-QSB on May 15, 2003, and Form 8-K on May 23, 2003. These filings contained untrue statements of material fact, were materially misleading, and omitted material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading. Unless restrained and enjoined by this Court, Diversified will continue to violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

162.    Defendant Valesc violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder by filing Form 10-KSB on April 15, 2003, Form 10-QSB on August 29, 2003, and Form 10-QSB/A on September 2, 2003. These filings contained untrue statements of material fact, were materially misleading, and omitted material facts necessary to make the statements made, in light of the circumstances in which they

were made, not misleading.  Unless restrained and enjoined by this Court, Valesc will continue to violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

163.     Defendant NICH violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder by filing Form 8-K on June 25, 2003, Form 10-QSB on August 8, 2003, and Form 8-K on September 4, 2003.  These filings contained untrue statements of material fact, were materially misleading, and omitted material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Unless restrained and enjoined by this Court, NCIH will continue to violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-1 thereunder.

## SIXTH CAUSE OF ACTION

## AIDING AND ABETTING FALSE FILINGS WITH THE COMMISSION

**Violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13  [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 13a-13]**

164.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 145 above.

165.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 13a-13] thereunder, requires companies filing reports with the Commission to file reports that do not contain untrue statements of material fact or omit material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

166.   Aiding and abetting liability arises when there is (1) a violation of the securities laws by some other party; (2) a general awareness by the aider and abettor that his or her role is part of an overall activity that is improper; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.  Either willfulness or reckless indifference to a known obligation or set of facts will satisfy the scienter requirement to be held liable as an aider and abettor.

167.   Defendants Jon H. Marple and Blake, and each of them, aided and abetted F10 in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder in that Jon H. Marple and Blake knew, or were willfully or recklessly indifferent to knowing, that Form 10-QSB filed by F10 on February 14, 2003, and signed by John H. Marple and Blake, Form 10-KSB filed by F10 on July 11, 2003, and signed by Jon H. Marple and Blake, and Form 10-QSB filed by F10 on August 14, 2003, and signed by Jon H. Marple and Blake, were materially misleading and omitted information.  Unless restrained and enjoined by this Court, Jon H. Marple and Blake will continue to aid and abet F10 in violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

168.   Defendant Chapman aided and abetted Diversified in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder in that Chapman knew, or was willfully or recklessly indifferent to knowing, that Form 10K-SB signed by Chapman and filed by Diversified on April 18, 2003, Form 10-QSB signed by Chapman and filed by Diversified on May 15, 2003, and Form 8-K signed by Chapman and filed by Diversified on May 23, 2003 were materially misleading and omitted information.  Unless restrained and enjoined by this Court,

Defendant Chapman will continue to aid and abet Diversified in violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

169.   Defendants Kraus and Cohen aided and abetted Valesc in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder in that Kraus and Cohen knew, or were willfully or recklessly indifferent to knowing, that Form 10-KSB signed by Kraus and Cohen and filed by Valesc on April 15, 2003, Form 10-QSB signed by Cohen and filed by Valesc on August 29, 2003, and Form 10-QSB/A signed by Cohen and filed by Valesc on September 2, 2003 were materially misleading and omitted information. Unless restrained and enjoined by this Court, Defendants Kraus and Cohen will continue to aid and abet Valesc in violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

170.   Defendant Carlucci aided and abetted NCIH in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder, in that he knew, or was willfully or recklessly indifferent to knowing, that Form 8-K signed by Carlucci and filed by NCIH on June 25, 2003, Form 10-QSB signed by Carlucci and filed by NCIH on August 8, 2003, and Form 8-K signed by Carlucci and filed by NCIH on September 4, 2003 were materially misleading and omitted information. Unless restrained and enjoined by this Court, Defendant Carlucci will continue to aid and abet NCIH in violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder.

## SEVENTH CAUSE OF ACTION

### FALSELY CERTIFYING FILINGS WITH THE COMMISSION

#### Violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rule 13a-14 thereunder [17 C.F.R. § 240.131-14]

171.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 145 above.

172.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] requires companies filing reports with the Commission to file reports that do not contain untrue statements of material fact or omit material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Rule 13a-14 thereunder [17 C.F.R. 240.13a-14], requires the principal executive officer and principal financial officer of the company to sign a certification that the report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which such statements were made, not misleading.

173.   Defendants Jon H. Marple and Blake violated Section 13(a) of the Exchange Act and Rule 13a-14 thereunder in falsely certifying Form 10-QSB filed on February 14, 2003 and Form 10-KSB filed on July 11, 2003. Defendant Blake also violated Section 13(a) of the Exchange Act and Rule 13a-14 thereunder by falsely certifying Form 10-QSB filed on August 14, 2003.  Unless restrained and enjoined by this Court, Defendants Jon H. Marple and Blake will continue to violate Section 13(a) of the Exchange Act and Rule 13a-14 thereunder.

174.   Defendant Chapman violated Section 13(a) of the Exchange Act and Rule 13a-14 thereunder in falsely certifying Form 10-KSB filed on April 18,

2003 and Form 10-QSB filed on May 15, 2003. Unless restrained and enjoined by this Court, Defendant Chapman will continue to violate Section 13(a) of the Exchange Act and Rule 13a-14 thereunder.

175.   Defendants Kraus and Cohen violated Section 13(a) of the Exchange Act and Rule 13a-14 thereunder in falsely certifying Form 10-KSB filed by Valesc on April 15, 2003, Form 10-QSB filed by Valesc on August 29, 2003, and Form 10-QSB/A filed by on September 2, 2003. Unless restrained and enjoined by this Court, Defendants Kraus and Cohen will continue to violate Section 13(a) of the Exchange Act and Rule 13a-14 thereunder.

176.   Defendant Carlucci violated Section 13(a) of the Exchange Act and Rule 13a-14 thereunder in falsely certifying Form 10-QSB filed by NCIH on August 8, 2003. Unless restrained and enjoined by this Court, Defendant Carlucci will continue to violate Section 13(a) of the Exchange Act and Rule 13a-14 thereunder.

## EIGHTH CAUSE OF ACTION

## OFFER AND SALE OF SECURITIES BY UNREGISTERED BROKER OR DEALER

### Violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

177.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 145 above.

178.   Defendants Sukumo and Newman, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities in Stem Genetics, F10, Diversified, Valesc, and NCIH without



being registered as a broker or dealer with the Commission or associated with a broker-dealer registered with the Commission.

179. By reason of the foregoing, Defendants Sukumo and Newman violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. 78o(a)].

## REQUEST FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I

Issue findings of fact and conclusions of law that the Defendants committed the violations charged herein.

### II

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily restrain, and preliminarily and permanently enjoin, Defendants Sukumo and Newman, and their officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act and Rule 10b5 thereunder.

### III

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminarily and permanently restrain and enjoin Defendants Wolfson, NuWay, Momentous, Leeward, G&G Capital, Stem Genetics, Robertson, Carlucci, F10, Jon H. Marple, Blake, Jon R. Marple, Grateful Internet, Diversified, Chapman, Valesc, Kraus, Cohen, and NCIH, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who



receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b5 thereunder.

**IV**

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminarily and permanently restrain and enjoin Defendants F10 and Valesc, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

**V**

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminary and permanently restrain and enjoin Defendant Diversified, and its officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

**VI**

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminary and permanently restrain and enjoin Defendant NCIH, and its officers, agents, servants, employees, attorneys, and accountants, and those persons in

active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder.

## VII

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminary and permanently restrains and enjoin Defendants Jon H. Marple, Blake, Kraus, and Cohen, and their officers,  agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Rule 13a-14 of the Exchange Act and from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## VIII

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminary and permanently restrain and enjoin Defendant Chapman, and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Rule 13a-14 of the Exchange Act and from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.



## IX

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminary and permanently restrain and enjoin Defendant Carlucci, and his officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Rule 13a-14 under the Exchange Act and from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13 thereunder.

## X

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that temporarily, preliminarily and permanently enjoins Defendants Wolfson, NuWay, Momentous, Leeward, G&G Capital, Carlucci, Sukumo, Newman, Stem Genetics, Robertson, F10, Jon H. Marple, Blake, Jon R. Marple, Grateful Internet, and NCIH, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from:  (A) transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets, claims, or other property or assets owned or controlled by, or in the possession or custody of these Defendants; and (B) transferring, assigning, selling, hypothecating, or otherwise disposing of any assets of Wolfson, NuWay, Momentous, Leeward, G&G Capital, Carlucci, Sukumo, Newman, Stem Genetics, Robertson, F10, Jon H. Marple, Blake, Jon R. Marple, Grateful Internet, and NCIH that exist or that are in the custody or control of Wolfson, NuWay, Momentous, Leeward, G&G Capital, Carlucci, Sukumo, Newman, Stem Genetics, Robertson, F10, Jon H. Marple, Blake, Jon R. Marple, Grateful Internet, and NCIH.



## XI

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminary and permanently restrain and enjoin Defendants, and each of them, and their officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, books, records, computer programs, computer files, computer printouts, correspondence, including e-mail, whether stored electronically or in hard-copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of the Defendants.

## XII

Enter an order directing Defendants Sukumo and Newman to consent to the disclosure of records by offshore financial institutions.

## XIII

Enter an order directing Defendants Sukumo and Newman to repatriate all funds wired from escrow accounts in the United States to offshore accounts at the Thai Military Bank and the Laos-Viet Bank in Vientiane, Laos or any other offshore account into which funds identified in this action have been deposited.

## XIV

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## XV

Enter an order directing Defendans Wolfson, NuWay, Momentous, Leeward, G&G Capital, Sukumo, Newman, Stem Genetics, Robertson, Carlucci, F10, Jon H. Marple, Blake, Jon R. Marple, Grateful Internet, Diversified, Valesc, and NCIH to



disgorge all ill-gotten gains received during the period of violative conduct and all prejudgment interest on such ill-gotten gains.

## XVI

Permanently bar Defendants Wolfson, Robertson, Carlucci, Jon H. Marple, Blake, Chapman, Kraus, and Cohen from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, as amended [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## XVII

Permanently bar Defendants Wolfson, Newman, Carlucci, Robertson, Jon R. Marple, Chapman, Kraus, and Cohen from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## XVIII

Grant such further equitable relief as this Court deems just, appropriate, and necessary, including, but not limited to, a freeze of assets, alternative service of process and the acceleration of discovery, including the forthwith production of documents.

## IXX

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all



orders and decrees that may be entered, or to entertain any suitable application or motion

for additional relief within the jurisdiction of this Court.

Dated this _____ of October 2003.

Respectfully submitted,

Thomas M. Melton
Karen L. Martinez
United States Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah  84144
Tel.  801.524.5796